MILLS v. RUSSELL MFG. CO.

(Circuit Court, D. Connecticut. April 4, 1905.)

No. 1,157.

PATENTS—INFRINGEMENT—CARTRIDGE BELTS.
    The Mills patents, Nos. 756,177 and 756,178, for cartridge belts, construed, and *held* not infringed.

In Equity. Suit for infringement of letters patent Nos. 756,177 and 756,178 for cartridge belts, granted to Anson Mills March 29, 1904. On final hearing.

Marcellus Bailey, for complainant.

H. A. Seymour, for defendant.

PLATT, District Judge. This is a suit charging infringement of two letters patent granted to complainant for improvements in cartridge belts—Nos. 756,177 and 756,178—both dated March 29, 1904, and capable of conjoint use in the one belt. The infringement complained of is based upon a contract with the government dated May 2, 1904, entered into by the defendant, to manufacture and sell certain belts, similar to a sample belt marked "B," which was submitted with the bid and made a part of the contract, which plaintiff claims contains the invention of the patents in suit. This is substantially the same as the belt which on October 24, 1904, was pronounced satisfactory, and which will be made and delivered under the contract; the only difference being that Sample B is handmade, and not quite as neat and uniform as the latter. On all the issues, it would seem immaterial which belt shall be made the basis of discussion. The latter is Exhibit Russell Manufacturing Company's 1904 Cartridge Belt. When preparing to bid, defendant found at the War Department a sample belt like complainant's Exhibit Sample Belt. It refused to follow the sample, giving as the reason that the construction of the pocket on that belt was patented, but guarantying one equal, if not superior, to the sample, and one more presentable and useful; but nothing was said about the narrow end which forms the subject of the other patent.

The defenses are: (1) noninfringement; (2) lack of patentable invention; (3) lack of novelty.

It is imperative to set forth the somewhat peculiar history connected with the belt of patent 756,177, before it is possible to construe the claim with any accuracy. The outlines alone will be sketched in. Prior to 1902 complainant had enjoyed the privilege for many years of furnishing the government with service belts for carrying individual cartridges, which were known as single or double loop belts. In 1902 a new rifle was adopted, which required cartridges in clips; five cartridges being held together by each clip. 'Since this model could not at once displace all the service rifles, it followed naturally that a belt was required which should not only retain the clips when the belt was carelessly handled, but should be so constructed as to prevent single cartridges

from slipping out in like circumstances. In February, 1903, Gen. Mills, the complainant, was asked to submit a suitable belt to meet the emergency. He complied, but on March 28, 1903, the board of ordnance condemned all the samples which had been submitted, giving divers reasons for such action, and offered suggestions as to what was needed. From these we find that the board suggested that the belt to be satisfactory must have (1) ten pockets instead of eight; (2) pockets must be without thimbles, aprons, or partitions; (3) the flaps must be of single thickness and as short as possible; (4) that part of the body of the belt having no pockets should be reduced in width to 1¾ inches immediately after the end pockets; (5) the two ends of the belt must be secured by a bronze buckle, which should always remain equally distant from the end pockets, and the belt should be capable of easy and quick fastening. Both complainant and defendant submitted samples and bids in accordance with the suggestions contained in the board's report. The defendant's bid was far below that of complainant, but was rejected, without giving any reason, so far as appears. Complainant's bid was rejected because it was excessive, although the department had known in advance what the bid was to be, and had suggested no reduction. When the unfavorable report of March 28, 1903, was handed to complainant by Capt. Gibson, it appears by Gen. Mills' testimony that Capt. Gibson told him a narrower buckle was advisable, and asked him if he could not prolong the belt from the last pocket on either side 13 inches, so as to have two narrower webs or billets at each end, to which the narrower buckle could be adjusted. After the June bids were rejected, proposals were again issued on July 25, and the bids were opened on August 25, 1903. Complainant submitted again the samples offered at the June bids, materially reducing its price on belts and suspenders; the defendant offering no belt, but submitting suspenders with prices. Complainant's bid was accepted, and the sample with equal width until the very end is reached was adopted, and the contract with the government signed, October 19, 1903.

The original application for patent 756,177 was filed August 12, 1903, which was, as will be seen, during the suspense between the proposal for bids of July 25 and their opening on August 25, 1903. As filed, it covered both narrowed ends and pockets. It was divided, and the divisional application was filed October 14, 1903, five days prior to signing the contract under which the long billet ends were not accepted. This application, viewed from any angle which the observer may desire, is an exceedingly interesting production, and deserves careful examination. Time is too precious to permit me to dissect and analyze the proceeding as minutely as it warrants. The drawings of the original application present the precise construction suggested by the March 28, 1903, report. One element of the combination in the claims is the "narrow end portions, A'." The specification states that "the pockets stop short of the ends of the belt, and these ends are reduced in width as shown; this being for the comfort and convenience of the wearer, and to permit of the use of fastening devices of small dimensions." It will be remembered

that Capt. Gibson, from the board, had told Gen. Mills soon after the March 28th report that a narrower buckle was advisable, and asked him if he could not prolong the ends, with that idea in view. The specification then proceeds to explain how to form the narrow ends with selvage edges, and protect the place where the reduction in width occurs at the shoulders, c, by metallic binders, d. In all this the thought clearly is to get long, narrow ends, so that the fastening buckle can be narrow, and to prevent raveling where those ends begin to be narrow, by housing with metal the threads which were cut off in the loom where the width of the selvaged webbing was suddenly reduced. The purpose of the shoulder, c, is obvious. It is further explained in the specifications how the narrow ends can be "bent back on themselves" to hold "buckles, clasps, or other fastening devices." The inference is irresistible that on October 14, 1903, when the divisional application was filed, the long, narrow end was a feature of the belt which was believed to have found favor in the eyes of the authorities, and was worth nurturing and protecting.

The application of October 14, 1903, which has just been partially explained, was allowed November 9, 1903. In the meantime the government had entered into the contract with complainant for belts like the other sample, on which no long, narrow end appeared. It would seem to have taken a few days for the patentee to recover from the shock which the changed condition of things produced. At any rate, he invested no additional funds when notified of the allowance. On the contrary, a request to amend the application, under rule 78, without withdrawing the case from issue, was recommended by the examiner, and approved by the acting commissioner. In accomplishing this extraordinary feat, the patentee not only took out the old specifications and claims, and inserted new ones, reducing the claims to one, on account of surplusage, but canceled the old drawing and substituted a new one; saying as he did so:

"This new drawing is furnished because of the oral suggestion of the examiner that the construction which is the subject of the application, although clearly set forth in the specifications, is somewhat obscure in the original drawing."

I am constrained to applaud the acumen of the examiner. The original drawing shows ten pockets. The unpocketed portion is materially reduced in width immediately after the end pockets. The long, narrow ends are shown as bent back upon themselves. The amended drawing shows nine pockets. Vide contract of October 19, 1903. The unpocketed part is only slightly reduced in width, and that reduction does not take place immediately after the end pockets, but considerably beyond that place. The attempt to show the ends bent back upon themselves is weak, and in Fig. 2 what little, narrow end does exist is pretty much all cut away. The specification undertakes to convey the idea that the narrowed ends are devised to permit the use of narrow fasteners, which, by bending back, may be engaged with eyelets between the pockets

on the under portion of the belt. The narrow center buckle idea of the original application has vanished into thin air.

With this monstrosity allowed in December, the final cash investment was deferred until March 7, 1904, and on March 10, 1904, the department sent out proposals for the bids of April 9, 1904. The patent was issued March 29, 1904, and 11 days later the bids were opened. The proposals of March 10th called for a belt of uniform width throughout its length, and provided with nine pockets. The defendant's bid was accepted, and we now come back to the question of whether the belt which it proposes to furnish is an infringement of the patent in suit No. 756,177.

In connection with my story of the divisional application, I have, I think, commented sufficiently to show that my conclusion obviously must be that the "narrowed ends" of the patent in suit must be the "narrow end portions, A'," of the original application, shown in both specification and drawing, and appearing again in the drawing of the patent, and that, since no such narrowed end can be found in defendant's proposed belt, there can be no infringement found in this respect. In the patent in suit another limiting feature shown, is that the cartridge pockets on the belt are "formed integral therewith." Patents 399,924 and 666,687 are referred to in the specifications, and from them we can obtain light on the meaning of those words. Both of the patents referred to show a belt in which the two sides and bottom of the pockets are woven integral with the body of the belt, and compel us to so construe them now. The defendant's pockets are not woven integral with the body of the belt in the three necessary directions. They are formed by weaving long loops, integral with the belt so far as the sides go, but open at both ends. The lower end is then firmly stitched into the belt, and in this way a pocket is made. This is a small matter, but is worth noticing. There is a determined effort made by complainant to sustain his theory of the narrow end fastening invention, by claiming that the wide end fastenings, which hooked over the two sides of the belt, and which have been used since 1889 in the army, under complainant's patent of March 4th of that year, and are still in large use, mutilated, chafed, abrased, and horribly tortured the soldiers. Complainant's wide army experience, and that of his expert, are placed in high light for the purpose of bringing out the most effective contrast. If one could believe that a kindly government had permitted such horrors to continue for such an unreasonably long time, with wider, tighter, and unsuspended belts, it is impossible to be satisfied that the suffering must continue as long as the hook-over fastenings are used, now that the belts are narrower and looser, and are largely sustained by the shoulders, from which they practically hang by the suspender. The picture of the tortured soldier is, in my opinion, an elusive fantasy. The board of ordnance complained about the hook fastenings because they wore out the edges of the webbing, and said no more. The original specifications failed to invoke this "field service" argument. I cast it aside.

Having reached the conclusion indicated, it would be wasteful to follow the various elements of the claim to the last analysis, as sur-

veyed with the prior art in view; but I am bound to say, in passing, that I have enjoyed my study of that question, and that, aside from the narrow end, as I construe the claim, with its selvaged edge, I can find no patentable novelty or invention therein.

We turn now for a moment to No. 756,178. This is the single claim:

"A woven cartridge-belt having cartridge-receiving pockets, and covers therefor, of greater width than the pockets to which they are applied, attached to the back wall of their pockets, and prolonged below their point of attachment as loose strips of similar width, which extend substantially to the bottom of their respective pockets, as and for the purposes hereinbefore set forth."

By the drawings and specifications we find that the belt of the patent in suit has covers wider than the pockets, and of substantially the same width throughout their length. The cover or flap is secured to the back wall of the pocket at only one point, which is by three eyelets near the top, and is prolonged beyond the point of attachment, as a loose strip of similar width, to the bottom of the pocket, whereby a curl is produced on each side of the pocket for its entire depth. This curl has two uses: First, to prevent the escape of loose cartridges; second, to prevent the drawing out of the loose depending end as cartridges are being withdrawn by hand. In defendant's belt we find that the outer and upper portion of the interior part of the cover is of the same width as the pocket, while the lower and inner portion is tapered, so that it becomes somewhat narrower at the bottom, and narrows for almost the entire depth. The upper portions are secured to the pocket by three eyelets, but the lower, narrower ends are firmly stitched to the back wall of the pocket. That portion of the cover which comes over from the top is slightly wider than the pocket, to prevent the escape of loose cartridges, but the lower interior part is narrower than the width of the pocket, thus leaving more available space within the pocket. This difference in construction appears to be due to the fact that complainant's pocket was woven integral with the belt on three sides. It was therefore impossible to narrow the strip on the inside of the pocket and sew it down, so that it might not be caught up in pulling cartridges out. The only thing left to do was to let it go to the bottom of the pocket with its extra width, and depend upon the curl or corrugation to prevent the catching up while extracting cartridges. Defendant's construction cannot be pulled out in any circumstances, and adds considerably to the roominess of the pocket by eliminating the cumbrous curls or corrugations. When the introduction of the cartridge clips demanded a new style of pocket, the requirements of the board were that the depending end of the flap should be effectively secured in place, and not form a shoulder to obstruct the ready withdrawal of the clips. Gen. Mills accomplished this as best he could, in view of his integral pocket. Mr. Fisher did a better thing, because he was not hampered by Gen. Mills' integral construction at the lower end of the pocket. I cannot follow the complainant in his contention that his patent broadly covers wide flaps fastened inside the

pockets to prevent the escape of loose cartridges. In both cases, if any invention exists, it is of the narrowest kind, and must be limited to the precise construction claimed.

I will not dabble with the prior art on paper, except to say that it has been long common to cover pockets with a flap wide enough on the outside to prevent the escape of small articles, but the question here turns upon the disposal of that portion of the flap which goes down into the pocket. This portion of defendant's construction is made in conformity with letters patent 764,803, dated July 12, 1904. The issuance of this patent so soon after the complainant's patent in suit raises a presumption that there is a patentable difference between them, and I can see nothing which rebuts that presumption.

The general conclusion reached is that defendant's construction does not infringe either of the claims in issue, and the bill must be dismissed.